CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 23 2008

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **TERRANCE HENDERSON,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:07-cv-00266** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **COMMONWEALTH OF** | ) | |
| **VIRGINIA, et al.,** | ) | **By: Hon. Glen E. Conrad** |
| **Defendants.** | ) | **United States District Judge** |

Proceeding pro se, plaintiff Terrance Henderson brings this civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. Plaintiff, an inmate at Red Onion State Prison ("ROSP") in Pound, Virginia, alleges that defendants[1] employed at ROSP and with the Virginia Department of Corrections ("VDOC") have violated his constitutional rights in several respects. Plaintiff seeks monetary damages and injunctive relief. Defendants Yates, Smith, and Bowen have filed motions to dismiss, the remaining defendants have filed a motion for summary judgment, and plaintiff has responded. Therefore, the complaint is ripe for the court's review. For the reasons that follow, the court will grant the defendants' motions except as to one claim. On the existing record, the court is unable to resolve Henderson's claim that Warden Ray violated his First Amendment rights by refusing him commercially distributed photographs and, therefore, orders an evidentiary hearing on the issue.[2]

---

[1] Plaintiff's complaint names the Commonwealth of Virginia as a defendant in this matter. A state is not a "person" within the meaning of 42 U.S.C. § 1983; therefore, the Commonwealth is not an appropriate defendant in this suit. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Additionally, plaintiff appears to be attempting to sue some of the defendants in both their official and individual capacities for acts he alleges defendants committed under color of state law. However, insofar as such defendants are sued in their official capacities, they are immune from suit. Id.

[2] To the extent plaintiff's complaint could be construed to assert claims under state law, the court will take these matters under advisement at this time.

# I. Plaintiff's Claims

Plaintiff alleges in his complaint that (1) officers retaliated against him by filing false disciplinary reports against him on at least two occasions, with the result that he was placed on the finger foods diet and/or diet loaf, both of which were nutritionally inadequate and caused him physical injury and pain; (2) Officers Garrett and Hamilton used excessive force against him on December 19, 2006; (3) defendants K. McCoy, Tate, and Ray used excessive force against him when they placed him in ambulatory restraints and kept him in a cold cell for nine hours without bedding or clothing; (4) defendant S. Mullins fabricated an Incident Report concerning the ambulatory restraints incident; (5) Hearing Officer L. Mullins convicted him of a charge of aggravated assault upon a non-inmate without due process; (6) he was denied due process during the disciplinary hearing that was the result of allegations against him that on October 7, 2005, he squirted feces on two officers; (7) he was wrongly removed from the Common Fare diet and placed on diet loaf due to false allegations made by defendant McCowan, and that the diet loaf caused him injury and emotional distress; (8) Warden Ray unlawfully censored his mail by refusing him commercially distributed photographs; and (9) ROSP inmates are arbitrarily and capriciously being denied the opportunity to purchase commissary items. Because plaintiff sets forth nine distinct claims, each with its own history of plaintiff's resort to the prison administrative remedy system, and because of the temporal and factual distinctions between the claims, the court will discuss separately the facts of each claim, the motions defendants have filed in response to each claim, and the attendant legal analysis of each claim.

2

## II. Standards of Review

### A. Motion for Summary Judgment

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Rule 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. Anderson, 477 U.S. at at 256-57.

### B. Motion to Dismiss

Dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure is limited to "the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." Browning v. Vecellio & Grogan, Inc., 945 F. Supp. 930, 931 (W.D. Va. 1996) (internal quotation omitted). When "considering a motion to dismiss, the court

3

should accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). While the complaint need not provide detailed factual allegations, the basis for relief in the complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). Assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." Id.

### III. Analysis

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

The Prison Litigation Reform Act ("PLRA") provides, in part, that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life," Porter v. Nussle, 534 U.S. 516, 532 (2002). Proper exhaustion of administrative remedy procedures for purposes of § 1997e(a) means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. See, e.g., Woodford v. Ngo, 548 U.S. ___, slip op. at 6-8 (2006). Section 1997e(a) applies whether or not the form of relief the inmate seeks is available through exhaustion of administrative remedies. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion provision is mandatory, even in those

4

instances where an inmate claims that exhaustion would be futile or the remedy inadequate. Id. at 741, n.6. In this case, defendants concede that all but one of plaintiff's claims have been fully exhausted.

**Claim 1:**

Henderson first alleges that officers "repeatedly retaliated against [him] for exercising his first amendment right to file complaints and grievances," by filing false disciplinary reports against him on at least two occasions, with the result that he was placed on the finger foods diet and/or diet loaf, both of which were nutritionally inadequate and caused him "severe hunger pangs, left him feeling nauseated and weak, and caused him to suffer immense mental anguish and emotional distress," "vomiting, and abdominal pains." (Compl. at 2-3, 5-6.) Specifically, Henderson alleges that defendant Lieutenant D. Tate approached Henderson's cell on March 19, 2006, and threatened Henderson in response to a grievance that Henderson had filed against Tate. Henderson contends that, later that day, Tate returned to Henderson's cell to inform him that he would be charged with offense code 111 (destroying state property) and be placed on a "finger food diet" for breaking a food tray. Henderson alleges that when he informed Tate that he did not break a tray, Tate said, "Yeah, I know, but that's what happens when you complain." (Compl. at 2.) Henderson further alleges that on September 12, 2006, Tate and defendant T. McCoy, another ROSP Lieutenant, again approached Henderson's cell and threatened him in response to grievances that Henderson had filed against them. Henderson was subsequently charged with offense code 201 (disobeying an order) and was placed on a "diet loaf" meal for seven days for allegedly refusing to return his meal tray. Henderson contends that this charge was later dismissed, which proves that defendants Warden Ray and Regional Director Huffman, "as supervisors," "were made aware of the retaliatory, wrongful, and

5

unlawful acts committed against plaintiff . . . [and] failed to act reasonably to stop the . . . acts." (Compl. at 4.) Henderson further alleges that defendant K. Chris, Chief of Security at ROSP, allegedly ordered Henderson to be placed on the disciplinary diets and failed to properly investigate Tate's false accusations. Henderson finally claims that B. Hubbard, D. McNight, and S. Woods, ROSP Food Service Supervisors, ignored his many requests and complaints.

Defendants contend that there is no evidence, other than Henderson's bare allegations, to support the contention that Tate or T. McCoy filed false disciplinary reports against Henderson. Further, defendants contend that Henderson suffered merely de minimis injuries subsequent to his placement on the disciplinary diets and such injuries are not actionable under § 1983. Tate testifies in an affidavit filed with the court that he does not specifically recall the incident on March 19, 2006, but that an incident report filed by him provides some details. The report indicates that Sergeant A. Mullins had set aside a destroyed meal tray to be investigated. It was Tate's belief that Henderson had cracked this tray due to his prior actions of destroying meal trays and his statements that he would continue to break his food trays so that he could be placed on a loaf diet. Specifically, Mullins reported that on March 18, 2006, Henderson stated to him that, "I will give you these trays back today but tomorrow you are not getting them back. I will break them up or do whatever I have to do to be put on the loaf meal." (Mot. Summ. J., Ex. 2 at 2.) Henderson had been placed on a finger foods diet from March 9, 2006, until March 17, 2006, and had been informed that, if his disruptive behavior continued, he would be placed back on the diet. Tate contends that, per Major Chris's instructions, he placed Henderson back on the finger foods diet on March 19, 2006, due to his statements to Mullins and the subsequent destruction of the meal tray. Tate states that, following an investigation of the matter, it was determined that there was not enough evidence to charge

6

Henderson with offense code 111. A charge was not filed and on March 23, 2006, he was removed from the finger foods diet. Tate claims that he did not make any of the unprofessional statements attributed to him by Henderson.

Tate further testifies in his affidavit that he also does not specifically recall the September 12, 2006 incident. An incident report filed on that date, however, reveals that at approximately 5:07 P.M., Officer M. Kendrick was picking up trash and trays in the C-4 pod. Henderson refused to return his tray to Kendrick, so Kendrick notified Tate of the situation. Tate and McCoy then entered the C-4 pod to speak with Henderson and, when given a direct order to return the tray, Henderson responded with profanity and refused. Since Henderson was not attempting to harm himself or produce a weapon with the food tray, the tray was left in the cell to be retrieved either when Henderson exited his cell or returned it to staff. Doctor Gilbert subsequently approved Henderson's placement on a restrictive feeding diet and, per Major Chris's orders, Henderson was placed on the diet loaf. Tate contends that at the disciplinary hearing concerning the matter, the Inmate Hearings Officer found Henderson not guilty due to "a discrepancy in the time that had been recorded on the report." (Mot. Summ. J., Ex. 2 at 4.) Tate contends that it is not unusual for charges to be dismissed due to technical discrepancy in the incident report and that this does not mean that the report was false or that it was written in retaliation.

Warden Ray testifies in his affidavit filed with the court that, if an inmate deliberately disrupts the food service operation by the misuse or abuse of food service utensils or food service equipment, he may be placed on the clinical precautionary diet ("CPD"), also known as finger foods diet. Inmates receive three CPD meals per day and those meals provide the same amount of calories and nutritional value as those foods served to inmates on the regular diet. The difference is that

7

foods that cannot generally be eaten with one's fingers are replaced with foods that can be easily eaten with the fingers. Ray states that he found that proper procedure was followed in both incidents and that Henderson was provided with a nutritionally adequate diet at all times. He further states that a review of the relevant pod camera clearly shows that Henderson refused to return his dinner tray to officers on September 12, 2006.

Food Service Supervisor McKnight testifies in his affidavit that inmates who disrupt food service operations may also be placed on restricted feeding, also known as diet loaf. Inmates placed on diet loaf are provided a bag meal twice each 24 hours. Each bag meal contains only one diet loaf, which is to be prepared without deviation from the recipe listed in Division Operating Procedure ("DOP") 414. Each loaf contains 1,250 calories, for a total of 2,500 calories per day. Pursuant to DOP 414, no inmate should be placed on restricted feeding procedures without review and approval of the institution's physician. Food service staff are not responsible for making the decision to place an inmate on restricted feeding, nor do they have the authority to remove an inmate from restricted feeding for any reason, medical or otherwise.

Claims of retaliation are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). In order to state a retaliation claim, the "plaintiff must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Id. at 75. Inasmuch as inmates do not have a constitutionally protected right to participate in a grievance procedure, Henderson's claim of retaliation would therefore also fail. See Adams, 40 F.3d at 75; Brown v. Dodson, 863 F. Supp. 284 (W.D. Va. 1994). Furthermore, the act of placing Henderson on a restricted diet on two occasions,

8

once for five days and once for seven days, did not violate Henderson's constitutional rights. There is no evidence that these diets are inadequate or meet the standards of cruel and unusual conditions. In Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993), the Fourth Circuit held that a prisoner must suffer, "serious or significant physical or mental injury" in order to be "subjected to cruel and unusual punishment within the meaning of the" Eighth Amendment. Henderson's complaints that he experienced uncomfortable digestive problems and that he was hungry are insufficient to state a claim under the Eighth Amendment. Defendants' evidence indicates that the CPD meals and the diet loaf meals provide the same amount of calories and nutritional value as those foods served to inmates on the regular diet. Plaintiff does not provide any evidence to the contrary, nor any medical evidence to substantiate a claim that he experienced any significant injury or that he lost weight. Courts have repeatedly rejected claims that a diet loaf violates a prisoner's constitutional rights. See LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (holding temporarily serving loaf diet does not invoke Eight Amendment protections); Williams v. Berge, 102 F. App'x 506 (7th Cir. 2004) (holding prisoners have no right to tasty or appetizing food so long as they are not being deprived of adequate nutrition). Accordingly, Henderson's retaliation claims fail and must be dismissed.[3]

**Claim 2:**

Henderson next claims that, on December 19, 2006, defendants Garrett and Hamilton, ROSP Correctional Officers, assaulted Henderson and used excessive force against him. Specifically, Henderson alleges that at approximately 6:25 P.M. on that date, Garrett and Hamilton were collecting

---

[3] The court further notes that any harassing or threatening comments made by defendants Tate or McCoy do not establish an Eighth Amendment claim for cruel and unusual punishment. Verbal abuse of inmates by prison officials, without more, does not rise to the level of an Eighth Amendment violation. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979), cited favorably in, Moody v. Grove, No. 89-6650, 1989 WL 107004, at *1 (4th Cir. Sept. 19, 1989).

9

trash and trays in the C-4 pod at ROSP. Henderson alleges that when the officers placed the tray slot

box, a stainless steel box weighing several pounds that is used when an item is placed into an

inmate's cell, in Henderson's tray slot, Henderson threw a dirty sheet into the box and informed the

officers that it needed to be discarded and that he wished to speak to the building sergeant.

Henderson alleges that he then began to place his cup into the box but Garrett removed the box and

Hamilton grabbed Henderson's right arm and held it against the tray slot. Henderson alleges that

Garrett then began "violently and repeatedly slamming the tray slot box against plaintiff's right hand

and screaming" profane language. (Compl. at 8.) Henderson alleges that he then stuck his left hand

out of the tray slot in an attempt to protect himself. Garrett allegedly began striking Henderson's left

hand and arm as well. Henderson admits that the lacerations on his hands and arms were treated by

ROSP medical staff immediately.

     Defendants contend that Henderson attempted to grab the officers through the tray slot and

that any injuries that he received were a result of his disruptive actions and their attempts to protect

themselves. They further contend that any injuries that Henderson received were de minimis and are,

therefore, not actionable under § 1983. Officer Hamilton states in an affidavit filed with the court

that when he and Officer Garrett arrived at Henderson's cell, Garrett opened the tray slot and

Henderson threw a sheet in the box, preventing Garrett from closing the tray slot. Hamilton observed

Garrett give Henderson several direct orders to remove the sheet from the tray slot box, but

Henderson replied with profanity. Garrett then removed the sheet from the tray slot himself and

attempted to secure the door but Henderson stuck his arms through the slot, knocked the box off of

the door, and attempted to grab Garrett's shirt. Hamilton claims that he attempted to secure

Henderson's arm, but that Henderson pulled his arm free. The officers then attempted to put the box

back on the cell door, but Henderson continued to be disruptive and continued to attempt to knock the box off. Hamilton held the box on the cell door until Sergeant Mullins arrived. After several direct orders from Mullins, Henderson complied and put his arms and hands back in his cell. Hamilton admits that Henderson received minor injuries as a result of the incident; however, Hamilton denies that he assaulted or intentionally injured Henderson and contends that any sustained injuries were a direct result of Henderson's own actions. Officer Garrett testifies to the same sequence of events in his affidavit. As a result of this incident, Henderson was charged with offense code 201 (disobeying an order) and pleaded guilty at a disciplinary hearing held on January 10, 2007.

To prevail on an excessive force claim, an inmate must establish that prison officials acted with a sufficiently culpable state of mind, and that the harm inflicted on the inmate was sufficiently serious. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). An inmate "need not show that [the force used] caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." Id. (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights, however. See Hudson, 503 U.S. at 9 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Absent the most extraordinary circumstances, an inmate must provide proof of more than de minimis injury. Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994).[4] An inmate must also satisfy a subjective component by showing that the force was applied "maliciously and sadistically for the purpose of

---

[4] In Norman, the United States Court of Appeals for the Fourth Circuit recognized that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain." Norman, 25 F.3d at 1263. In such circumstances, "the force will be 'of a sort repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 8).

11

causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986); see also Williams, 77 F.3d at 761.

This court finds that the injuries resulting from the stray slot incident were, in fact, de minimis, and Henderson does not argue to the contrary. Henderson's complaint alleges that he received an unspecified number of "lacerations" to his left hand from the altercation but provides no further information. (Compl. at 9.) In his reply brief, Henderson merely contends that there is a dispute "over who caused the injuries, the defendants' motives, and the seriousness of the injuries." (Pl. Resp. to Mot. Summ. J. At 7.) Henderson provides no further factual support for his allegedly serious injuries. The responding nurse's notes in the incident report states, "[i]nmate's right hand skin abrasion to middle finger and ring finger. Cleaned with sterile water and triple antibiotic ointment applied." (Mot. Summ. J., Ex. 1, Attach. D.) Such minor abrasions are insufficient to support a claim of excessive force. See Melvin v. North Carolina Dept. of Corrections, 64 F.3d 658 (Table) (4th Cir. 1995) (finding that the cuts and abrasions suffered by inmate during an altercation with prison officers as they attempted to take his radio from him were merely de minimis injuries); Cox v. Gaskins, No. 501CT936H, 2003 WL 23857306 (E.D.N.C. May 30, 2003) (finding that two lacerations to plaintiff's head and an injury to his nose were de minimis injuries). Moreover, it appears that the officers did not act with excessive force in their valid attempt to secure Henderson's tray slot. Henderson pleaded guilty at the disciplinary hearing on January 10, 2007. He admits that he placed a sheet in the tray slot box, and does not deny that officers ordered him to remove the sheet on several occasions or that the tray slot would not close due to the sheet. Thus, Henderson fails to illustrate that the force was not applied "in a good faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-21; see also Hudson v. McMillian, 503 U.S. 1, 7 (1992) (no excessive force

12

if amount of force commensurate with need therefor). Accordingly, Henderson's excessive force claim also fails and must be dismissed.

**Claim 3:**

Henderson next claims that defendants K. McCoy, Tate, and Ray used excessive force against him when they placed him in ambulatory restraints and kept him in a cold cell for nine hours without bedding or clothing. Specifically, Henderson claims that on May 31, 2006, he was in the C-4 pod taking a shower in the designated shower area. Henderson contends that he and an officer "got into a verbal altercation" and that consequently Henderson requested that he be removed from the shower and escorted back to his cell. Henderson alleges that the officer refused and notified Tate of the incident. (Compl. at 10.) Tate and several other officers approached and ordered Henderson to "strip" and to hand them his clothes. (Compl. at 10.) Henderson complied and the officers searched his clothing. The officers then handed the clothing back to Henderson and ordered him to dress and turn around to be restrained. Henderson again complied, was restrained, and escorted back to his cell. Henderson contends that he was then placed in ambulatory restraints and that defendant K. McCoy stated that he was being placed in the restraints due to his history of throwing feces at officers. Henderson contends that this statement illustrates that "the sole purpose for the plaintiff being placed in ambulatory restraints was to punish plaintiff and retaliate against him for his history of throwing feces on officers." (Compl. at 11.) Henderson further complains that the officers turned the water off in his cell, removed his hygiene and toiletry items, and left him in a hunched position in an extremely cold cell for approximately nine hours without any bedding or clothing except for a safety smock that covered only plaintiff's torso and thighs. He alleges that he suffered from mental anguish, emotional distress, and stiffness and pain in his lower back and legs.

13

Defendants contend that Henderson was placed in ambulatory restraints,[5] not as punishment for his history of throwing feces, but because of his disruptive behavior and to prevent further assault on other officers. K. McCoy states in an affidavit filed with the court that, on May 31, 2006, at approximately 10:25 A.M., Officers R. Sykes and C. Morelock placed Henderson in the C-4 pod shower. After Henderson had completed his shower, he informed the officers that he was ready to go back to his cell. When Sykes and Morelock arrived at the shower, Henderson sprayed feces over the top of the shower, out of what appeared to be a latex glove. The feces struck Sykes in the facial area, chest, and abdomen, and Henderson subsequently became verbally abusive, stating, "Fuck you bitches, I'm going to shit down the next cracker that comes to get me out of the shower." (Mot. Summ. J., Ex. 8 at 2.) Sergeant D. Tate was notified of the incident and arrived at the scene with Lieutenant S. Mullins. Tate and Mullins restrained Henderson and escorted him to his cell to be placed on ambulatory restraints, per the orders of Major Chris. K. McCoy states that he was the Building Commander on that date and was notified of the situation at approximately 10:35 A.M. He explains that he was not responsible for authorizing Henderson's placement on ambulatory restraints. Tate's description of this event is consistent with K. McCoy's version and Tate further indicates that all required procedures were completed, including advising the medical department of the situation prior to the placement of the restraints and checking Henderson once the restraints had been applied.

---

[5] K. McCoy explains that when an inmate is placed in ambulatory restraints, he is placed in leg irons and handcuffs, both of which are double locked. A black box is then placed over the center portion of the handcuffs, covering the keyhole. A security waist chain is placed through the black box and down to the leg irons, with just enough length to allow the inmate to stand completely upright, but limiting his movement. The inmate is allowed to use the bathroom, wash himself, feed himself, and walk around in these restraints, but his movements are limited in that he cannot lift his arms above his head or swing his arms around. The purpose for the use of ambulatory restraints is to prevent the inmate from further disruptive behavior towards staff or himself.

14

Warden Ray also informs the court that the medical department was contacted and that medical personnel advised the officers that there was no reason why the ambulatory restraints could not be used on Henderson. Henderson was further checked by Nurse J. Mullins who noted that she was able to place two fingers under each restraint. No injuries were noted. Moreover, per policy, all property was removed from Henderson's cell, his clothing was removed, and he was given a safety smock to wear. Furthermore, Warden Ray states that the temperature logs for the C-4 pod indicate that on May 31, 2006, the temperatures for the pod ranged from 70 to 73 degrees. Ray also states that there is nothing in the segregation file to indicate that Henderson's water was turned off during the time period that he was in restraints. However, if the water is turned off in an inmate's cell, the procedure necessitates that the water be turned back on for fifteen minutes every two hours, before meal breaks, and if the inmate requests that it be turned on so that he can use the toilet or wash. As a result of this incident, Henderson was charged with offense code 124 (the spitting/throwing or otherwise transferring of bodily waste/fluids on another person) and he chose to accept the penalty offer on June 9, 2006.

As previously explained, an inmate must satisfy two elements in order to establish a claim for excessive force: (1) that prison officials acted with a sufficiently culpable state of mind, and (2) that the harm inflicted on the inmate was sufficiently serious. Williams, 77 F.3d at 761. First, the court notes that the use of restraints to control prison inmates is not per se unconstitutional. Id. Moreover, this court has previously found that the extended use of ambulatory restraints, such as those used on plaintiff, does not violate the Eighth Amendment. See Teal v. Braxton, Case No. 7:04-cv-00406, 2006 WL 467985 (W.D. Va. Feb. 29, 2006) (unpublished); Shelton v. Schilling, Case No. 7:04-cv-00228, 2005 WL 2406094 (W.D. Va. Sept. 29, 2005) (unpublished). Furthermore,

15

Henderson has failed to proffer evidence to establish that he suffered any permanent or serious injury as a result of being placed in ambulatory restraints. He does not provide any medical evidence to support a claim of any injury at the time that he was released from the ambulatory restraints and he does not contend that he voiced any complaints at that time. Without evidence of more than de minimis injuries such as "pain" and "stiffness," Henderson's claims related to his placement in ambulatory restraints cannot survive the institutional defendants' motion for summary judgment. See Norman, 25 F.3d at 1263; Keyes v. O'Brien, No. 7:06-cv-00437, slip op. at *4 (W.D. Va. July 27, 2006) (finding no constitutional violation where inmate was restrained for thirty hours by ambulatory restraints and he failed to allege that he suffered any actual injury as a result of the restraint). Accordingly, this excessive force claim must also be dismissed.[6]

**Claim 4:**

The court also finds that Henderson's fourth claim, that defendant S. Mullins fabricated an incident report to support the claims made by the other defendants concerning the ambulatory restraints incident, is without merit. Warden Ray states in his affidavit that there was no incident report submitted by Lieutenant S. Mullins regarding this issue. S. Mullins also indicates in an affidavit filed with the court that he was not present when the incident occurred between Henderson and Officer Sykes and, thus, he did not file any incident reports. Henderson has offered no evidence

---

[6] Insofar as Henderson's claims could be construed to include a claim that his placement in ambulatory restraints constituted cruel and unusual punishment in violation of the Eighth Amendment, the court notes that while the Eighth Amendment protects prisoners from cruel and unusual living conditions, an inmate is not entitled to relief simply because of exposure to uncomfortable, restrictive, or inconvenient conditions of confinement, for, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Furthermore, a plaintiff must allege facts sufficient to show either that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions or that the conditions have created an unreasonable risk of serious damage to his future health. Strickler v. Waters, 989 F.2d 1375, 1380-81 (4th Cir. 1993); Helling v. McKinney, 509 U.S. 25 (1993). As the court has already determined, Henderson's claims of "pain" and "stiffness" are insufficient to constitute serious physical injury, thus, his claim under this analysis fails as well.

to the contrary. Accordingly, Henderson's conclusory allegations of conspiracy fail to state a claim on which relief may be granted under 42 U.S.C. § 1983, and must be dismissed.

**Claim 5:**

Henderson next claims that Hearing Officer L. Mullins convicted him of a charge of aggravated assault upon a non-inmate without due process. Specifically, Henderson alleges that on September 26, 2005, he was served with a disciplinary charge for "assaulting staff." (Compl. at 13.) Henderson contends that even though he requested that Mullins review the video footage of the purported incident, which allegedly would have proven that he was innocent of the charge, Mullins refused. Henderson claims that he was convicted of intentional, impermissible, physical contact resulting in serious injury, but alleges that the injured officer merely tripped over a mattress and a laundry bag in his cell floor, even after being warned that the items were on the floor. He contends that this does not "meet the 'physical contact' requirement." (Resp. Mot. Summ. J. at 11.) Henderson complains that he was denied due process because Mullins refused to review the video, denied Henderson the opportunity to present evidence in the form of the injured officer's medical records, and provided an "insufficient statement of reasons" for his determination of guilt. (Compl. at 15.)

Defendants contend that Henderson's conviction was proper and that he received sufficient due process during his disciplinary hearing. L. Mullins states, in an affidavit filed with the court, that he was selected and appointed as an Inmate Hearing Officer ("IHO") to conduct disciplinary hearings. The individuals appointed have adequate knowledge of the disciplinary process, are objective, impartial decision makers, and meet all qualifications and training requirements set by the Deputy Director of Operations. Mullins explains that on September 25, 2006, at approximately 9:05

17

P.M., officers attempted to extract Henderson from his cell subsequent to Henderson throwing feces through his mail slot at an officer and refusing to be restrained. Prior to the extraction, Henderson barricaded the entrance to his cell using a mattress and laundry bag. When the entry team entered the cell, Officer W. Sturgill tripped over the barricade, injuring his back, neck, and forehead. As a result of this incident, Henderson was charged with offense code 105a (aggravated assault upon a non-inmate).

On September 26, 2006, Officer Power served Henderson with a copy of the Disciplinary Offense Report and advised him that his disciplinary hearing would be held on September 29, 2005. Henderson requested an advisor be appointed to assist him. He also requested witnesses and Sturgill's medical documentation concerning the incident. On September 28, 2005, IHO Mullins advised Henderson that Sturgill's medical information had not been obtained as it was restricted. Henderson did not file an additional documentary evidence request form, nor did he file witness request forms related to this charge.

On September 29, 2005, Henderson was advised that his disciplinary hearing had been postponed until October 3, 2005. On October 3, 2005, at approximately 6:55 P.M., Henderson's disciplinary hearing commenced. Henderson was present for the hearing and pleaded not guilty to the 105a charge. During the hearing, Sturgill testified that he was the shield man on the cell extraction team and when he entered Henderson's cell, he tripped over a mattress and a laundry bag. Sturgill also testified that he struck the bunk with his head and that he had a large bruise on his head, and that he had an "aggravated neck and back" injury. (Mot. Summ. J., Ex. 10 at 3.) Henderson testified that he did not come into contact with Sturgill and that Sturgill's injuries were not serious. Mullins contends that, based on the testimony provided, and his review of the evidence, he

18

determined that Henderson's actions were intended to interfere with the cell team entry and to cause injury or serious injury. Accordingly, Mullins found Henderson guilty of offense code 105a and fined him $12.00. Mullins contends that he did not find it necessary to review the video prior to rendering his decision, based on Henderson's admission that he had placed the mattress and laundry bag in front of his cell door. Mullins claims that reviewing the video tape would not have proved Henderson's innocence in the matter.

As previously stated, Henderson alleges that his due process rights were violated at the October 3, 2005 prison disciplinary hearing. A prison disciplinary action implicates a liberty interest requiring due process safeguards when the punishment imposed inflicts an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 414 U.S. 472, 484 (1995). The determination of whether such an atypical and significant hardship exists is a question of law. Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997). In this case, Henderson's penalty for the disciplinary conviction was a $12.00 fine. This court cannot find that this penalty posed an atypical and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life. See Beverati, 120 F.3d at 504 (holding that a six-month term in segregation did not impose an atypical hardship where the inmates alleged that their cells were infested with vermin and smeared with urine; that no outside recreation was permitted; that there were no religious services available; and that food was served in considerably smaller portions); McMillan v. Fielding, 136 F. App'x 818 (6th Cir. 2005) (finding that ten days in lock up, the loss of package privileges, and a $4.00 fine did not constitute an atypical and significant hardship in the context of prison life); Wheeler v. Hannigan, 37 F. App'x 370 (10th Cir. 2002) (finding that the extraction of a monetary fine does not generally implicate an inmate's due process rights). Because Henderson did not

19

possess a liberty interest in avoiding the imposition of a monetary fine, he was not entitled to federal due process protections before receiving this penalty.[7]

Furthermore, due process for prison disciplinary hearings is satisfied when the findings of the disciplinary authority are supported by "some evidence." Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 454-55 (1985). "Some evidence" does not in any way imply that prison disciplinary bodies must consider all possible evidence. The record demonstrates that IHO L. Mullins thoroughly investigated the charges against petitioner at the hearing. The record further demonstrates that the evidence presented by Officer Sturgill was sufficient to support the punishment petitioner received. As such, Henderson's due process rights were not violated by the absence of additional evidence in the form of video surveillance footage or Sturgill's medical records. The evidence relied upon by IHO L. Mullins clearly exceeds the "modicum of evidence" necessary to justify the imposition of a monetary fine. Id. at 454-55. Accordingly, this claim is without merit and must be dismissed.

**Claim 6:**

Henderson next claims that he was denied due process during the disciplinary hearing concerning an October 7, 2005 incident where it was alleged that he squirted feces on two officers. Specifically, Henderson alleges that on October 7, 2005, during an outdoor exercise period in the C-4

---

[7] To the extent that Henderson seeks to challenge the deprivation of his personal property, his allegations are similarly deficient. The intentional or negligent deprivation of personal property by a prison employee acting outside the scope of official policy or custom does not rise to the level of a constitutional violation, so long as the state provides an adequate post-deprivation remedy. See Hudson v. Palmer, 468 U.S. 517, 533 (1984); Parratt v. Taylor, 451 U.S. 527, 545 (1981) overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986). In this case, Henderson could have utilized the Virginia Department of Corrections' Inmate Grievance Procedure to challenge the deprivation of his personal property. Furthermore, other state law remedies, including the Virginia Tort Claims Act, were available to the plaintiff as a means to seek compensation for his property. See Wadhams v. Procunier, 772 F.2d 75, 77-78 (4th Cir. 1985); Ballance v. Young, 130 F. Supp. 2d 762, 767 (W.D. Va. 2000). Accordingly, inasmuch as plaintiff had adequate state remedies, the deprivation of his personal property did not rise to the level of a constitutional violation.

Recreation Yard, an inmate named L. Douglas threw "something" at Officers B. Cox and A. Bartee. (Compl. at 15.) Henderson claims that the officers mistakenly accused him of throwing the substance because he and Douglas were next to each other at the time of the incident. On December 21, 2005, Henderson was ultimately charged with offense code 111 (intentionally destroying, altering, or damaging state or any person's property). Henderson complained that he was wrongfully charged of the offense and requested a review of the video footage of the C-4 Recreation Yard, "laboratory test results to prove that the substance that was thrown at the officers was feces," and documentation proving that the officers' uniforms were ruined because of the incident. (Compl. at 16.) Henderson contends that this evidence was not considered by IHO L. Mullins at his disciplinary hearing. Henderson complains that he presented evidence in the form of his testimony and a witness statement from inmate L. Douglas in which Douglas admitted to committing the offense, but that Mullins still found him guilty of the offense. A penalty of restitution in the amount of $303.78 was imposed for the replacement cost of the two sets of uniforms and gear.

This court previously considered and dismissed this claim in <u>Henderson v. Virginia</u>, No. 7:06cv00408, slip op. at *9-12 (W.D. Va. Sept. 21, 2007). Henderson alleges that his prior claim was based on a denial of due process for a disciplinary hearing concerning offense code 124 (spitting/throwing, or otherwise transferring of bodily waste/fluids on another person). He contends that his current claim concerns denial of due process for a disciplinary hearing concerning offense code 111; therefore, "the two claims are not the same." (Resp. Mot. Summ. J. at 3.) The court's review of the prior adjudication reveals that the two offense codes were the result of the same October 7, 2005 incident. The court fully addressed the factual and procedural allegations as to each disciplinary hearing, thoroughly evaluating plaintiff's claims regarding both offense code 111 and

code 124, and determined that there were no violations of due process. "Collateral estoppel foreclosses 'the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate.'" Sedlack v. Braswell Servs. Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998) (internal citation omitted). Accordingly, as the claim raised herein has been previously considered and rejected by this court and no new or previously undetected matters are now alleged, the court will not consider it. The claim will be dismissed.

**Claim 7:**

Henderson further claims that he was wrongly removed from the Common Fare diet[8] and placed on the diet loaf due to false allegations made by defendant McCowan. Specifically, Henderson alleges that Sergeant D. McCowan falsely accused him of refusing to return his tray on March 13, 2007. Henderson alleges that he was subsequently placed on the diet loaf meal from March 14, 2007, to March 20, 2007. Henderson contends that his removal from the Common Fare diet constitutes cruel and unusual punishment in violation of the Eighth Amendment and that it placed a substantial burden on his exercise of religion, in violation of the First Amendment.

Henderson further contends that ROSP medical staff were deliberately indifferent to his serious medical needs subsequent to his placement on the diet loaf. Henderson complains that, when he ate the diet loaf for breakfast on March 14, 2007, he "began to uncontrollably vomit acidic bile, he began to feel dizzy and nauseated, and he began to experience excruciating stomache [sic] pain." (Compl. at 18.) Henderson alleges that he filed an emergency grievance complaining of the alleged

---

[8] The Common Fare diet is designed to meet the needs of a wide variety of religious groups, including Jews and Muslims. See Madison v. Virginia, 474 F.3d 118, 123 (2006); Acoolla v. Angelone, et al., No. 7:01-cv-01008, slip op. at 6 (W.D. Va. Sept. 1, 2006). Henderson contends that he should receive the diet to "accommodate his religious dietary requirements." (Compl. at 21.)

22

symptoms and requesting removal from the diet loaf meal but that Nurse D. Yates responded noting, "'your grievance does not meet the definition for an emergency . . . scheduled for nursing sick call.'" (Compl. at 19.)  Henderson complains that even though he had a documented history of gatro-intestinal problems and he was in "severe pain," Nurse Yates refused to immediately evaluate him and was, therefore, deliberately indifferent to a serious medical need.  (Compl. at 19.)  Henderson alleges that on March 15, 2007, he again ate the diet loaf and immediately began to vomit "acidic bile," "blood," and "a black 'coffee ground' material." (Compl. at 19.)  He alleges that he began experiencing chest pain, difficulty breathing, extreme stomach pain, and black excrement. Henderson filed another emergency grievance form complaining of his symptoms but the response by Nurse Yates merely stated, "'you have been seen by a nurse for this.'" (Compl. at 19-20.) Henderson admits that he was evaluated by Nurse H. Bowen but contends that "no medical treatment was rendered." (Compl. at 20.)  Henderson also admits that he was evaluated by ROSP Physician, Dr. Smith, on March 16, 2007, but contends that he was escorted back to his cell "untreated." (Compl. at 20.)  Henderson complains that Dr. Smith authorized Henderson's continued placement on the diet loaf.  Henderson contends that he subsequently refused to eat the diet loaf from that date until March 20, 2007, and that he consequently suffered severe physical weakness, fatigue and mental anguish.

Defendants contend that Henderson's claims are without merit.  Sergeant McCowan, C-4 Building Sergeant, testifies in his affidavit filed with the court that on March 13, 2007, Officer Kendrick ordered Henderson to return his dinner tray.  Henderson refused to comply, stating, "'I'm not done yet.'" (Mot. Summ. J., Ex. 12 at 1.)  McCowan contends that Henderson had over forty minutes of time in which to eat his meal prior to Kendrick's order.  McCowan alleges that he

23

attempted to retrieve the tray, but Henderson still refused. Per the approval of Warden Ray, as well as Dr. Smith, Henderson was placed on restricted feeding (diet loaf) for seven days. Henderson also received a charge for offense code 201 (disobeying an order) and was convicted and fined $10.00. Warden Ray further explains in his affidavit filed with the court that Henderson was not even entitled to be on the Common Fare diet on March 13, 2007. Ray states that ROSP records reveal that on December 10, 2006, Henderson refused to accept his Common Fare meal and requested a regular meal. He was therefore removed from the Common Fare diet on December 13, 2006, after review by the Institutional Classification Authority. Ray states that Henderson has not been approved for the Common Fare diet since that date, nor has he subsequently applied for or requested to be placed back on the diet.

Inmates clearly retain protections under the First Amendment, including the right to free exercise of religious beliefs. Cruz v. Beto, 405 U.S. 319, 322 (1977). A sincere personal religious belief warrants this constitutional protection, regardless of whether the belief is mandated by a particular established religion or held by a majority of the believers within a religion. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 716 (1981) (finding that federal courts are not to sit as arbiters of religious orthodoxy). Inmates have a constitutional right to receive a nutritious diet in keeping with their sincere religious beliefs. Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973). An inmate must first demonstrate, however, that the requested diet is based on his sincere, religious belief and that the diet choices already available to him substantially burden his religious practice. See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51 (1988) ( "[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their

24

religious beliefs, [do not] require government to bring forward a compelling justification for its otherwise lawful actions"). Officials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu that do not offend his sincere beliefs. Abernathy v. Cunningham, 393 F.2d 775, 778 (4th Cir. 1968).

Furthermore, in deference to the expertise of prison administrators in managing the difficult challenges of incarceration, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge so long as it is rationally related to a legitimate governmental interest. Turner v. Safley, 482 U.S. 78, 89-81 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). Turner requires the court to consider four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns. Id. at 89-91.

Under these principles and viewing all facts in the light most favorable to the plaintiff, the court finds no evidence to support the notion that Henderson has a sincere, religious belief that requires that he maintain a kosher diet through the Common Fare diet. Henderson provides the court with no evidentiary support for his claim that his dietary preference for the Common Fare diet is based on any religious principles. Henderson merely makes conclusory references to his "religious dietary requirements" but fails to inform the court exactly what religion he subscribes to or what his religious dietary requirements are. (Compl. at 21.) More significantly, Henderson does not dispute

25

defendants' claims that he was not entitled to receive the Common Fare diet at the time he was

placed on the diet loaf and that he has not requested replacement on the Common Fare diet since

being removed from it in December of 2006. Moreover, defendants' actions are arguably rationally

related to the legitimate governmental interest of enforcing prison rules and regulations. See Rayes

v. Eggars, 36 F.3d 1100 (Table) (8th Cir. 1994) (finding that defendants' act of serving plaintiff

"nutri-loaf" as a punishment for violating prison regulations did not proximately cause him to suffer

a First Amendment violation, even assuming he sincerely believed his religion prohibited the

consumption of meat); Boswell v. Vidor, 924 F.2d 1057 (Table) (6th Cir. 1991) (affirming district

court's dismissal of plaintiff's claim that his religious rights were violated when defendants placed

him on a loaf diet allegedly containing pork for two days following his refusal to return his food

tray). Accordingly, Henderson's allegations fail to state a claim under the First Amendment and

must be dismissed.[9]

Furthermore, as this court has already noted, the act of placing Henderson on the diet loaf

---

[9] To the extent that plaintiff's allegations could be construed to state a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., it likewise fails, as plaintiff has failed to show that this isolated incident substantially burdened his exercise of religion. See Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006). The Supreme Court has defined "substantial burden" as one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas, 450 U.S. at 718; Lovelace, 472 F.3d at 187. Only when such a showing is made does the government bear the burden of persuasion that its practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. Lovelace, 472 F.3d at 187; Adkins v. Kaspar, 393 F.3d 559, 567 n. 32 (5th Cir. 2004), cert. denied, 545 U.S. 1104 (2005); Civil Liberties for Urban Believers v. Chicago, 342 F.3d 752, 760 (7th Cir. 2003), cert. denied, 541 U.S. 1096 (2004). Henderson does not raise any substantial allegations whatsoever in the instant complaint that the incident at issue here prevented him from exercising his religious practices, such as praying, studying religious materials, fasting, or, partaking of a diet in conformity with the dictates of his religion. At most, plaintiff raises mere conclusory allegations that eating the diet loaf violates unspecified religious beliefs, because it is clear from the facts recited above that plaintiff was not a Common Fare participant at the time of these allegations. Accordingly, the court finds that Henderson cannot show that the allegations of which he complains demonstrate that defendants placed "substantial pressure" on him "to modify his behavior and to violate his beliefs" so as to constitute a substantial burden on his religious exercise and, thus, these allegations fail under a RLUIPA analysis as well. Lovelace, 472 F.3d at 197.

Case 7:07-cv-00266-GEC-mfu   Document 41   Filed 01/23/08   Page 26 of 36   Pageid#: 540

meal for seven days did not violate his Eighth Amendment rights. See LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (holding that temporarily serving loaf diet does not invoke Eighth Amendment protections). Moreover, Henderson does not provide any evidence to substantiate a claim that he experienced any significant injury as required under Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993); see also Blount v. Williams, No. 7:05-cv-00556, slip op. at *5-6 (W.D. Va. Mar. 26, 2007) (finding that allegations of vomiting and stomach pain subsequent to eating a diet loaf were insufficient "injuries" to support an Eighth Amendment violation); Myers v. Milbert, 281 F. Supp. 2d 859, 855-56 (N.D.W. Va. 2003) (finding that the alleged adverse effects from eating "nutra-loaf"–vomiting, frequent bowel movements and burning in the chest and throat–were not serious medical conditions). Even taking all factual conflicts in a light most favorable to plaintiff, the court cannot find that there is any evidence to support the assertion that Henderson was subjected to cruel and unusual punishment within the meaning of the Eighth Amendment. Accordingly, Henderson's allegations fail to state a claim under the Eighth Amendment and must be dismissed.

Finally, to the extent that Henderson alleges deliberate indifference to a serious medical need by Dr. Smith, Nurse Bowen, and Nurse Yates, these claims also fail. In order to state a cognizable claim for denial of medical care under the Eighth Amendment, a plaintiff must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish deliberate indifference, a plaintiff must present facts to evince that the defendants had actual knowledge of and disregard for an objectively serious medical need. Farmer v. Brennan, 511 U.S. 825 (1994); see also Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a

27

condition for which lack of treatment perpetuates severe pain. See Farmer, 511 U.S. at 832-35; Sosebee v. Murphy, 797 F.2d 179, 182-83 (4th Cir. 1986); Loe v. Armistead, 582 F.2d 1291, 1296-97 (4th Cir. 1978). Disagreements between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment are not cognizable constitutional claims under the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Estelle, 429 U.S. at 105-06. Additionally, an inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).

Applying these principles to Henderson's allegations of deliberate indifference to a serious medical need, the court concludes that he has failed to state a claim under the Eighth Amendment. First, as the court has already observed, the medical problems reported by Henderson–brief episodes of vomiting, stomach pain, and difficulty breathing–are not sufficiently serious to give rise to an Eighth Amendment claim. See Myers, 281 F. Supp. at 855-856; see also Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999) (holding that an inmate failed to state a claim under the Eighth Amendment, since his complaints of breathing problems, chest pain, dizziness, sinus problems, headaches, and fatigue were "objectively speaking, relatively minor"); Blount v. Johnson, No. 7:05-cv-00556, 2006 WL 335606, at *4 (W.D. Va. Feb. 14, 2006) (finding no serious medical need where defendant stated that "acid was building up in his stomach" and he vomited all night and experienced

28

pain in his chest, stomach, and throat); Webb v. McKnight, No. 7:06-cv-00734, slip op. at *2 (W.D. Va. Dec. 20, 2006) (finding that plaintiff's complaints of indigestion, constipation, headaches, vomiting, and emotional distress did not constitute a serious medical need); Ross v. McGinnis, No. 94-A-6742, 2004 WL 1125177, at *10 (W.D.N.Y. Mar. 29, 2004) (holding that inmate's complaints of abdominal pain, vomiting, heartburn, constipation, body odor, and extreme body heat did not constitute a serious medical need).

Moreover, Henderson has failed to establish that Nurse Yates, Nurse Bowen, and Dr. Smith acted with deliberate indifference to his complaints. To the contrary, Nurse Yates immediately responded to Henderson's March 14, 2007 emergency grievance and advised him that he would be placed on the sick-call list for evaluation. Henderson was evaluated by Nurse Bowen the very next day, March 15, 2007. Moreover, Henderson was examined by Dr. Smith on March 16, 2007, a mere two days from his initial complaint. Accordingly, Henderson fails to demonstrate that the medical staff acted with deliberate indifference. Henderson alleges, at most, claims of negligence, which are not actionable under § 1983. Sosebee, 797 F.2d at 181; Wright, 766 F.2d at 849. For these reasons, this claim will also be dismissed.[10]

**Claim 8:**

Henderson next alleges that Warden Ray unlawfully censored Henderson's mail by denying him the right to receive and possess a commercially distributed photograph of a woman in a bikini and a coupon for other such photographs that Henderson ordered through the mail. Henderson

---

[10] Having reviewed plaintiff's submissions, the court concludes that he has not properly exhausted his administrative remedies with respect to his claim that Sergeant McCowan filed a false charge against him. Institutional Ombudsman Taylor indicates in his affidavit filed with the court that Henderson has not filed any grievances stating that McCowan filed a false charge against him on March 13, 2007, and Henderson does not argue or supply any evidence to the contrary. Accordingly, the court will dismiss this claim, without prejudice, for failure to exhaust all available administrative remedies as required under 42 U.S.C. § 1997e(a).

claims that there is no legitimate penalogical interest to justify the Warden's alleged censorship, as the photograph "pose[s] no threat at all." (Compl. at 22.) He claims that ROSP policy allows inmates to order pornographic magazines and other photographs of scantily clad women and that his photograph is less likely to pose a threat to institutional security because it is not sexually explicit.

Defendants contend that the items were not distributed to Henderson because they threatened institutional security. Warden Ray explains that, pursuant to DOP 852, Incoming Publications, inmates are allowed to subscribe to, order, and receive publications directly from a legitimate source as long as they do not pose a threat to the security, discipline, and good order of the facility, and are not detrimental to inmate rehabilitation. Publications which promote violence, disorder, or the violation of a state or federal law and/or any material containing sexually explicit ads, including sexual acts in violation of state or federal law, are prohibited for receipt by inmates. The Virginia Department of Corrections ("VDOC") restricts the receipt of sexually explicit materials by inmates because the content of such materials is detrimental to security, institutional order, public safety, inmate rehabilitation, and the safety of inmates and staff. Sexually explicit material in the prison environment undermines these goals as such materials are considered by inmates to be valuable "currency" in bartering within the prison setting. The possession and exchange of items that are considered valuable leads to stealing, fights, assaults, and other disruptive activities by inmates that threaten the security and safety of inmates and staff. The Warden does not dispute, however, that inmates are allowed to receive and possess magazines which include photographs of nude women.

Warden Ray informs the court that on February 13, 2007, the grievance department received a regular grievance from Henderson in which he stated that his photo and a coupon from Acme Publications were disapproved by the mail room on February 8, 2007. On March 5, 2007, Ray

30

provided the Level I response advising Henderson that Acme Publication sends sample photos as an advertisement for their product and that these nude or semi-nude photos could be used for barter. Furthermore, the coupon that was included did not include Henderson's name and could, thus, be used by anyone making it valuable for barter as well.

As a prison inmate, plaintiff retains certain First Amendment rights, including the right to receive written publications. Thornburgh v. Abbott, 490 U.S. 401, 407-408 (1989). However, an inmate's constitutional rights are not unrestricted. Prisons may adopt regulations that infringe upon an inmate's constitutional rights as long as the regulations are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 87 (1987). In order to determine whether the regulation relied on by the defendants is constitutionally permissible, the court must consider four factors: (1) whether the disputed regulation is logically connected to the legitimate government interest invoked to justify it; (2) whether the inmate has alternative means of exercising the right in question; (3) the impact that accommodation of the asserted right would have on other inmates, prison officials, and the allocation of prison resources; and (4) whether there is a ready alternative that would fully accommodate the inmate's rights. Turner, 482 U.S. at 89-90. When applying these factors, the court must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation is unconstitutional. See Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

Applying the Turner factors to this case, the court cannot conclude from the present record that prohibiting Henderson from receiving the photograph and coupon that he describes is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 87. The VDOC does have a legitimate interest in maintaining security, discipline, and order in its prisons. See Hodges

31

v. Virginia, 871 F. Supp. 873, 876 (W.D. Va. 1994) ("[t]he interests articulated by the VDOC, security, discipline, order, public safety, and rehabilitation, need no defense"), rev'd on other grounds, Montcalm Publ. Corp. v. Beck, 80 F.3d 105 (4th Cir. 1996). As Warden Ray specified in his Level I response to Henderson's grievance in this matter, some photographs could "pose a threat to personal or institution safety and security in violation of [policy]" because such items have "value and could be used for barter." Penological interests are negatively impacted by sexually explicit publications that promote the commission of criminal activity, such as the bartering of photographs. Id. However, Henderson contends that the photograph is not sexually explicit and the court cannot reconcile the fact that some inmates are permitted to receive magazines with depictions of semi-nude and nude women while Henderson is prohibited from receiving a commercially distributed photograph of a woman in a bikini. While the court recognizes that it must respect "the determinations of prison officials," Stotts, 925 F.2d at 86, the defendants' grievance responses provide no basis for the distinction. The court could understand the prohibition of photographs of an unclothed spouse or friend. Such photographs could be bartered or prove the subject of considerable dispute. On the other hand, there is no legitimate government interest served in denying receipt of a photograph which could just as easily be found in a magazine which the inmates can presumably receive and possess.[11] It remains to be determined to which category plaintiff's photograph belongs. Therefore, the court is unable to conclude on the current record that the defendants' prohibition of Henderson's possession of the commercial photograph of a bikini-clad woman, is logically related to maintaining security, discipline, and order in its prisons. Accordingly, the court will order an evidentiary hearing on this issue.

---

[11] The court believes that the prison might reasonably deny receipt and possession of the coupon, as it clearly could be used in barter.

32

**Claim 9:**

Henderson finally claims that ROSP inmates are "arbitrarily and capriciously" being denied the opportunity to purchase commissary items. (Compl. at 23.) Henderson contends that defendants Ray, Huffman, and Johnson "are denying segregation inmates the opportunity to purchase consumable (food) commissary items, as well as walkmen, absent security or medical reasons to justify the denial." (Compl. at 23.) Henderson claims that he is "entitled to the same treatment as general population inmates." (Compl. at 23.)

Warden Ray explains in his affidavit that on January 8, 2007, a memorandum from John Jabe, Deputy Director of Operations, was issued regarding a revision to inmate classification. The memo stated that, based on the results of a thorough study of the VDOC's classification system, ROSP would no longer be classified to a security level, effective February 1, 2007. Assignment to ROSP is now considered Administrative Segregation (Security Level S) and is not based on security level scores, but rather the need for long term segregation, based on the Segregation Qualifiers (Addendum 1 to DOP 823).[12] ROSP is not classified as a Level 5 institution and will not be operated in the same manner as a Level 5 institution. ROSP's Progressive Housing is considered a "step down" unit from Level S, but does not meet the criteria of Level 5. Once an inmate completes both levels of progressive housing successfully, he will then be considered for transfer to a lower level institution.

Ray further explains that, pursuant to DOP 861.3(V)(20), inmates assigned to special housing are allowed a $40.00 Commissary spending limit per month for personal hygiene products, over-the-counter medication, and legal materials only. Tobacco and consumable food or drink items are

---

[12] The Segregation Qualifiers are behaviors that qualify an inmate for assignment to Level S. Examples of some Segregation Qualifiers are: conviction of a charge for offense code 105, aggravated assault on staff (S-1), and excessive disciplinary charges, reflecting the inmate's inability to adjust to a lower level of supervision (S-6).

prohibited. Inmates in segregation units at all facilities also have a $40.00 Commissary spending limit per month for personal hygiene and legal materials only. The purchase of tobacco and consumables is prohibited. Segregation inmates may only have one electronic item in their cells. At ROSP, that one item is a closed circuit television, which shows only religious and educational programming. At all other facilities, the one electronic item segregation inmates may possess is a headphone-type portable audio device, commonly referred to as a "Walkman."

Since May 3, 2006, ROSP has offered a Privilege Incentive Plan for segregation inmates, which provides long-term segregation inmates with an opportunity to purchase consumable items from the commissary. The Privilege Incentive Program does not allow inmates to possess a Walkman, as segregation inmates may possess only one electronic item; however, the plan does offer access to satellite television channels on the weekends for those inmates who qualify. To be eligible for this program, an inmate must be Category I infraction free for two years, and Category II infraction free for one year.

Ray explains that segregation is not a disciplinary measure, but a means of custodial or protective control. Segregation consists of protective custody and custodial management measures exercised by the facility for the welfare of the inmate or the facility or both. He states that ROSP records reveal that, for the annual review cycle May 22, 2005, through May 22, 2006, Henderson received seven 100 series disciplinary infractions and thirteen 200 series disciplinary infractions. For the annual review cycle May 22, 2006, through May 22, 2007, he received two 100 series disciplinary infractions and ten 200 series disciplinary infractions. Accordingly, Ray contends that Henderson is well-qualified to be assigned to ROSP segregation because of his excessive disciplinary infractions which reflect his inability to adjust to a lower level of supervision and a behavior that

34

threatens institutional security. Furthermore, he is not currently eligible to participate in the Privilege Incentive Program due to his many disciplinary infractions.

The court first notes that Henderson appears to have failed to exhaust his administrative remedies as to this issue. Henderson provides the court with an inmate request for information/service, an informal complaint form, and two regular grievance forms, both of which were rejected during intake for failing to provide insufficient information. Henderson fails to provide the court with proof that he remedied the insufficiencies of his two regular grievances or that he attempted to appeal their determinations. Section 1997e(a) applies whether or not the form of relief the inmate seeks is available through exhaustion of administrative remedies. Booth, 532 U.S. at 741. The exhaustion provision is mandatory, even in those instances where an inmate claims that exhaustion would be futile or the remedy inadequate. Id. at 741, n.6.

Regardless, the court finds that Henderson's claim fails on the merits. Henderson complains only that he does not have the same "privileges" as general population inmates because of his assignment to a segregation unit and the change in security level at ROSP. The imposition of security measures that limit privileges within a particular institution are merely "part of the penalty that criminal offenders pay for their offenses against society"and, therefore, do not state a cognizable claim for relief under the Eighth Amendment. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Furthermore, while being confined in segregation may be restrictive and inconvenient, Henderson does not allege that he has suffered a serious mental or physical injury as a result of his conditions of confinement in segregation as required under Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993), and there is no indication that the conditions pose an unreasonable risk of serious harm. See also In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174

35

F.3d 464, 471-72 (4th Cir. 1999) (finding that long-term placement in segregation or maximum custody is not cruel and unusual punishment). Accordingly, the court concludes that plaintiff has failed to state a claim under the Eighth Amendment.[13]

## IV. Conclusion

For the stated reasons, defendants' motion for summary judgment will be denied as to Henderson's First Amendment claim and defendants' motion for summary judgment and motions to dismiss will be granted as to all other claims. The court will refer the matter to United States Magistrate Judge Michael F. Urbanski, pursuant to 28 U.S.C. § 636(b)(1)(B), for conduct of a hearing and the preparation of a Report and Recommendation, setting forth findings of fact, conclusions of law, and recommended disposition as to Henderson's claim that Warden Ray violated his First Amendment rights by refusing him a commercially distributed photograph. An appropriate Order will be entered this day.

The Clerk is directed to send copies of this Memorandum Opinion and accompanying Order to plaintiff and to all counsel of record for defendants.

ENTER: This 23rd day of January, 2008.

_____
United States District Judge

---

[13] To the extent that Henderson's allegations could be construed to assert a claim under the Due Process Clause of the Fourteenth Amendment, it must fail as well. Henderson's refusal to comply with the ROSP regulations and policies subjected him to a variety of disciplinary penalties, including isolation penalties, loss of commissary privileges, recreation restrictions, shower restrictions, and electrical appliance restrictions, before eventually leading to his placement in segregation. An inmate generally does not have a liberty interest in being housed at a particular institution or in avoiding isolation or separation from the general prison population In re Five Percenters, 174 F.3d at 471-72 (indefinite duration of the segregation does not render it unconstitutional); Kennedy v. Blankenship, 100 F.3d 640, 642 n. 2, 643 (8th Cir. 1996) (holding that placement in punitive isolation was not atypical and significant deprivation even though prisoner faced restrictions in mail, telephone, visitation, commissary, and personal-possession privileges). Thus, Henderson's attempt at a due process claim also fails for lack of an underlying protected liberty interest.